Case 8:24-cr-00047-PX   Document 11   Filed 03/13/24   Page 1 of 16

☑ FILED ___ ENTERED
___ LOGGED ___ RECEIVED

11:51 am, Mar 13 2024
AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ Deputy



**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*
*Southern Division*

KOH
Nicholas Potter
Special Assistant United States Attorney
Nicholas.Potter@usdoj.gov

Mailing Address:
6500 Cherrywood Lane, Suite 200
Greenbelt, MD 20770-1249

Office Location:
6406 Ivy Lane, 8th Floor
Greenbelt, MD 20770-1249

DIRECT: 301-344-4034
MAIN: 301-344-4433
FAX: 301-344-4516

March 12, 2024

Gary E. Proctor, Esq.
Gary E. Proctor, LLC
8 E Mulberry St Baltimore, MD 21202

      Re:    <u>United States v. Brian Thornel Elzey</u>,
             Criminal No. PX-24-47

Dear Counsel:

      This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, Brian Thornel Elzey (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by **March 13, 2024**, it will be deemed withdrawn. The terms of the Agreement are as follows:

<u>Offenses of Conviction</u>

      1.    The Defendant agrees to waive indictment and plead guilty to an Information charging him: (1) in Count One, with Interference with Interstate Commerce by Robbery, in violation of 18 U.S.C. § 1951(a); and (2) in Count Two, with Using, Carrying, and Brandishing a Firearm During and in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(c). The Defendant admits that the Defendant is, in fact, guilty of the offenses and will so advise the Court.

<u>Elements of the Offenses</u>

      2.    The elements of the offenses to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

          a.    <u>Count One (Interference with Interstate Commerce By Robbery)</u>: That on or about the time alleged in the Information, in the District of Maryland, the Defendant (1) the Defendant knowingly obtained or took the personal property of another, or from the presence of another; (2) the Defendant took this property against the victim's will, by actual or threatened force, violence, or fear of injury, whether immediately or in the future; and (3) as a result of the

Defendant's actions, interstate commerce, or an item moving in interstate commerce, was delayed, obstructed, or affected in any way or degree.

      b.    <u>Count Two (Using, Carrying, and Brandishing a Firearm During and in Relation to a Crime of Violence)</u>: That on or about the time alleged in the Information, in the District of Maryland, the Defendant (1) committed a crime of violence that could be prosecuted in a court of the United States, specifically Interference with Interstate Commerce by Robbery as alleged in Count ~~Seven~~ One of the ~~Indictment~~ Information, and (2) knowingly used, carried, brandished, and ~~discharged~~ a firearm during and in relation to the charged crime of violence.

*WFP 3/13/24   JES 3/13/24   BE*

      3.    **Penalties**

The maximum penalties provided by statute for the offenses to which the Defendant is pleading guilty are as follows:

| Count | Statute | Minimum Prison | Maximum Prison | Supervised Release | Maximum Fine | Special Assessment |
|---|---|---|---|---|---|---|
| 1 | 18 U.S.C. § 1951(a) | N/A | 20 years | 3 years | $250,000 | $100 |
| 2 | 18 U.S.C. § 924(c) | 7 years (consecutive to any other term of imprisonment) | Life | 5 years | $250,000 | $100 |

      a.    Prison: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

      b.    Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

      c.    Restitution: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

      d.    Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

      e.    Forfeiture: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

      f.    Collection of Debts: If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a

schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

<u>Waiver of Rights</u>

4.   The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

   a.   If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to have a grand jury consider the charges in the Information. The Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

   b.   If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

   c.   If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

   d.   The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

   e.   If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the

charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

    f.  By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

    g.  If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

    h.  By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

Advisory Sentencing Guidelines Apply

    5.  The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

Factual and Advisory Guidelines Stipulation

    6.  This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein. This Office and the Defendant further agree and stipulate that the conduct described in the Statement of Facts establishes the commission of additional offenses (including carjacking, in violation of 18 U.S.C. § 2119, transportation of a stolen vehicle, in violation of 18 U.S.C. § 2312 and interference with interstate commerce by robbery, in violation of 18. U.S.C. § 1951), that the conduct is relevant conduct, and that the

guidelines applicable to that conduct should be considered by the Court, pursuant to United States Sentencing Guidelines ("U.S.S.G.") §§ 1B1.2(c) and 1B1.3.

Group One: Carjacking on or about July 26, 2022

    a.    The applicable base offense level is **20**, pursuant to U.S.S.G. § 2B3.1(a).

    b.    A **2**-level increase applies, pursuant to U.S.S.G. § 2B3.1(b)(5), because the offense involved carjacking.

    c.    An additional **3**-level increase applies, pursuant to U.S.S.G. § 2B3.1(b)(2)(E), because a dangerous weapon was brandished or possessed.

Group Two: Robbery of Retail Business B – July 28, 2022

    d.    The applicable base offense level is **20**, pursuant to U.S.S.G. § 2B3.1(a).

Group Three: Robbery of Retail Business C – July 28, 2022

    e.    The applicable base offense level is **20**, pursuant to U.S.S.G. § 2B3.1(a).

Group Four: Robbery of Retail Business D – July 29, 2022

    f.    The applicable base offense level is **20**, pursuant to U.S.S.G. § 2B3.1(a).

Group Five: Robbery of Retail Business E – July 29, 2022

    g.    The applicable base offense level is **20**, pursuant to U.S.S.G. § 2B3.1(a).

Group Six: Robbery of Retail Business G – July 30, 2022

    a.    The applicable base offense level is **20**, pursuant to U.S.S.G. § 2B3.1(a).

Group Seven: Robbery of Retail Business H – August 1, 2022

    h.    The applicable base offense level is **20**, pursuant to U.S.S.G. § 2B3.1(a).

    i.    A **5**-level increase applies, pursuant to U.S.S.G. § 2B3.1(b)(2)(C), because a firearm was brandished or possessed as part of the offense.

Group Eight: Robbery of Retail Business I – August 1, 2022

    j.    The applicable base offense level is **20**, pursuant to U.S.S.G. § 2B3.1(a).

k.  A **5**-level increase applies, pursuant to U.S.S.G. § 2B3.1(b)(2)(C), because a firearm was brandished or possessed as part of the offense.

Group Nine - Transportation of a Stolen Vehicle – August 2, 2022

l.  The applicable base offense level is **6**, pursuant to U.S.S.G. § 2B1.1(b)(2).

Group Ten (Count One): Robbery of Retail Business J – August 3, 2022

m.  The applicable base offense level is **20**, pursuant to U.S.S.G. § 2B3.1(a).

Group Eleven: Robbery of Retail Business K – August 3, 2022

n.  The applicable base offense level is **20**, pursuant to U.S.S.G. § 2B3.1(a).

o.  A **5**-level increase applies, pursuant to U.S.S.G. § 2B3.1(b)(2)(C), because a firearm was brandished or possessed as part of the offense.

Group Twelve: Robbery of Retail Business L – August 3, 2022

p.  The applicable base offense level is **20**, pursuant to U.S.S.G. § 2B3.1(a).

q.  A **5**-level increase applies, pursuant to U.S.S.G. § 2B3.1(b)(2)(C), because a firearm was brandished or possessed as part of the offense.

Grouping

r.  Pursuant to U.S.S.G. § 3D1.2(d), Groups One through Eight and Groups Ten through Twelve do not group.

s.  Pursuant to U.S.S.G. § 3D1.4(a) and (b), because the groups with the highest offense level (Groups One, Seven, Eight, Eleven and Twelve) have an adjusted offense level of **25**, and Groups Two, Three, Four, Five, Six, Ten, are 5 to 8 levels less serious, the total number of Units is therefore 8. Accordingly, a **5**-level increase applies to the highest offense level.

t.  The total adjusted offense level is therefore **30**.

Acceptance of Responsibility

u.  This Office does not oppose a **2**-level reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a) based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional **1**-level decrease in recognition of the Defendant's timely notification of the Defendant's intention to enter a plea of guilty. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a), and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if

the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

<u>Count Two (Use, Carry and Brandish a Firearm During and in Relation to a Crime of Violence)</u>

   v. Pursuant to 18 U.S.C. § 924(c)(1)(A)(ii), 18 U.S.C. § 924(c)(1)(D)(ii) and U.S.S.G. § 2K2.4, there is a mandatory minimum term of imprisonment of **seven years (84 months)**, as to Count Two, to be imposed consecutively to any other term of imprisonment imposed by the Court in Count One.

  7. There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

  8. Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

<u>Obligations of the Parties</u>

  9. At the time of sentencing, this Office and the Defendant reserve the right to advocate for a reasonable sentence, period of supervised release, and/or fine considering any appropriate factors under 18 U.S.C. § 3553(a). This Office and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office or the Defendant deem relevant to sentencing, including the conduct that is the subject of any counts of the Indictment. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

<u>Waiver of Appeal</u>

  10. In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

   a. The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute(s) to which the Defendant is pleading guilty is unconstitutional, or on the ground

that the admitted conduct does not fall within the scope of the statute(s), to the extent that such challenges legally can be waived.

      b. The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows:

          i. The Defendant reserves the right to appeal any term of imprisonment to the extent that it exceeds the top of the final advisory guidelines range as calculated by the Court at sentencing; and

          ii. This Office reserves the right to appeal any term of imprisonment to the extent that it is less than the bottom of the final advisory guidelines range as calculated by the Court at sentencing.

      c. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

Forfeiture

11. The Defendant understands that the Court may enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable to the offenses, substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offenses.

12. Specifically, but without limitation on the Government's right to forfeit all property subject to forfeiture as permitted by law, the Defendant agrees to forfeit to the United States all of the Defendant's right, title, and interest in the following items that the Defendant agrees constitute money, property, and/or assets derived from or obtained by the Defendant as a result of, or used to facilitate the commission of, the Defendant's illegal activities: the $427.01 United States currency recovered from inside the Chevrolet Cruze on August 4, 2022.

13. The Defendant agrees to consent to the entry of orders of forfeiture for the property described herein and waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. This Office agrees to seek the Attorney General's approval to apply forfeited assets to the Defendant's Restitution Order.

14. The Defendant agrees to assist fully in the forfeiture of the above property. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the

forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

15. The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

Abandonment

16. The Defendant knowingly and voluntarily waives any right, title, and interest in the following property: a Taurus, Model G2C, 9mm caliber semi-automatic pistol bearing serial number AAM096052 (the "Abandoned Property") and consents to its federal administrative disposition, official use, and/or destruction.

17. The Defendant understands that he would have a right to file a claim to the Abandoned Property under 41 C.F.R. § 128-48.102-1 and waives his right to claim the Abandoned Property under 41 C.F.R. § 128-48.503. The Defendant agrees not to contest the vesting of title of the Abandoned Property in the United States Government and agrees to unconditionally release and hold harmless the United States Government, its officers, employees, and agents, from any and all claims, demands, damages, causes of actions, suits, of whatever kind and description, and wheresoever situated, that might now exist or hereafter exist by reason of or growing out of or affecting, directly or indirectly, the seizure or waiver of ownership interest in the Abandoned Property. The Defendant agrees to execute any documents as necessary to the waiver of right, title and interest in the Abandoned Property, including any forms necessary to effect the Defendant's waiver of ownership interest.

Defendant's Conduct Prior to Sentencing and Breach

18. Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

19. If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Rule 11(c)(1)(C); and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including

statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement. In that event, neither the Court nor the Government will be bound by the specific sentence or sentencing range agreed and stipulated to herein pursuant to Rule 11(c)(1)(C).

<u>Court Not a Party</u>

20.   The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

<u>Entire Agreement</u>

21.   This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Erek L. Barron
United States Attorney

*/s/ Nicholas Potter*
Nicholas F. Potter
Special Assistant United States Attorney

Timothy F. Hagan.
Assistant United States Attorney

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

03/13/24
Date

*Brian Elzey*
Brian Thornel Elzey

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

3/13/24
Date

Gary E. Proctor, Esq.
Jennifer E. Smith, Esq.

**ATTACHMENT A**

**STIPULATION OF FACTS**

*The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

On July 26, 2022 at approximately 10:00 p.m. in Bowie, Maryland, **BRIAN THORNEL ELZEY** ("**ELZEY**") was present while his co-conspirators displayed weapons and took a black Nissan Sentra sedan ("Nissan") bearing DC registration tag "ES5666" from the owner.

On July 28, 2022, **ELZEY**, Co-Conspirator 1, and another co-conspirator traveled in the stolen Nissan now bearing a different Maryland registration tag to fast food restaurants in Maryland and Virginia for the purpose of committing robberies. Specifically, at approximately 1:05 a.m., **ELZEY**, Co-Conspirator 1, and another co-conspirator arrived at the drive thru window of Retail Business A, a restaurant located in Annapolis, Maryland. A masked co-conspirator, sitting in the rear passenger seat exited the Nissan and walked toward the drive-through window. The co-conspirator handed coins to Victim 1, an employee of Retail Business A, through the drive-through window before placing his left hand in his pocket. As Victim 1 handed a receipt to the co-conspirator the co-conspirator reached through the window with both hands causing Victim 1 to retreat into the store. The co-conspirator then removed the cash drawer insert and some loose bills from inside Retail Business A. The co-conspirator then returned to the Nissan. **ELZEY**, Co-Conspirator 1, and the co-conspirator fled in the Nissan having taken approximately $600 United States currency from Retail Business A. As a result of **ELZEY's** actions, interstate commerce was delayed, obstructed, or affected.

An hour later, at approximately 2:06 a.m. **ELZEY**, Co-Conspirator 1, and another co-conspirator traveled in the Nissan to the drive-through window of a Retail Business B, a restaurant located in Dunkirk, Maryland. One of the co-conspirators, who was seated in the rear passenger seat, handed a handful of coins to Victim 2, an employee of Retail Business B, before acting as if he had dropped a part of the payment on the ground in the drive-through lane. The Nissan then pulled forward and the co-conspirator exited and approached the drive-through window. He briefly stepped away and then continued to pay Victim 2. After Victim 2 opened the cash drawer, the co-conspirator reached through the drive through window, shoved Victim 2, and grabbed the cash drawer insert. **ELZEY**, Co-Conspirator 1 and the other co-conspirator fled in the Nissan, having taken approximately $209 in United States currency from Retail Business B. As a result of **ELZEY's** actions, interstate commerce was delayed, obstructed, or affected.

Later that night, at approximately 8:30 p.m., **ELZEY**, Co-Conspirator 1, and another co-conspirator traveled to the drive-through window of Retail Business C, a restaurant in Falls Church, Virginia. One of the co-conspirators, who was seated in the rear passenger seat, exited the Nissan and handed several bills to Victim 3, an employee of Retail Business C. The co-conspirator stood at the drive-through window and, when Victim 3 opened the cash drawer, pushed through the drive-through window past Victim 3 and grabbed the cash drawer insert. **ELZEY**, Co-

Conspirator 1, and the other co-conspirator fled in the Nissan having taken approximately $274 in United States currency from Retail Business C. As a result of **ELZEY's** actions, interstate commerce was delayed, obstructed, or affected.

Early in the morning of July 29, 2022, at approximately 12:38 a.m. **ELZEY**, Co-Conspirator 1, and another co-conspirator traveled in the Nissan to the drive-through window of Retail Business D, a restaurant located in Silver Spring, Maryland and ordered food. One of the co-conspirators, who was seated in the rear passenger seat of the Nissan, exited and approached the drive-through window. The co-conspirator then paid Victim 4, an employee of Retail Business D. The co-conspirator next ordered an additional item and began to hand over U.S. currency to Victim 4 again. When Victim 4 opened the cash drawer, the co-conspirator shoved Victim 4 backward, removed the cash drawer insert (including the cash contained therein) and re-entered the Nissan. **ELZEY**, Co-Conspirator 1, and the co-conspirator fled in the Nissan having taken approximately $370 in United States currency from Retail Business D. As a result of **ELZEY's** actions, interstate commerce was delayed, obstructed, or affected.

Later that night, at approximately 9:35 p.m., **ELZEY** drove the Nissan with Co-Conspirator 1 in the rear passenger seat to the drive-through window of Retail Business E, a restaurant located in Dundalk, Maryland. After ordering food, Co-Conspirator 1, masked and wearing a white sweatshirt emblazoned with "Hollister" across the chest, exited the rear passenger seat of the Nissan and began to pay Victim 5, an employee of Retail Business E. After Victim 5 opened the cash drawer, Co-Conspirator 1 reached through the window and attempted to remove the cash drawer while Victim 5 attempted to close it. Co-Conspirator 1 then pushed Victim 5 away from cash drawer, grabbed the cash drawer insert, and then attempted to grab loose bills of U.S. currency that had been beneath the cash drawer insert. Co-Conspirator 1 then re-entered the Nissan through the rear passenger door with approximately $300 in United States currency while **ELZEY** drove away. As a result of **ELZEY's** actions, interstate commerce was delayed, obstructed, or affected.

At approximately 10:15 p.m. that night, **ELZEY** drove the Nissan with Co-Conspirator 1 in the rear passenger seat to the drive-through window of Retail Business F, located in Reisterstown, Maryland. After ordering food, Co-Conspirator 1, still masked and wearing a sweatshirt emblazoned with "Hollister" across the chest, exited the rear passenger seat of the Nissan and began to pay Victim 6, an employee of Retail Business F. After Victim 6 opened the cash drawer, Co-Conspirator 1 reached through the drive-through window and removed the cash drawer insert from Retail Business F. Co-Conspirator 1 then reentered the Nissan with the cash drawer insert through the rear passenger door and **ELZEY** drove away. **ELZEY** and Co-Conspirator 1 stole approximately $450 in United States currency from Retail Business F. As a result of **ELZEY's** actions, interstate commerce was delayed, obstructed, or affected.

Early in the morning of July 30, 2022, at approximately 12:15 a.m., **ELZEY** drove the Nissan with Co-Conspirator 1 in the rear passenger seat to the drive-through window of Retail Business G, a restaurant located in Towson, Maryland. Co-Conspirator 1, wearing a mask and the same sweatshirt emblazoned with "Hollister" across the chest, exited the rear passenger seat of the Nissan and began to pay Victim 7, an employee of Retail Business G. When Victim 7 opened the cash drawer, Co-Conspirator 1 reached through the drive through window, pushing past Victim 7,

and removed the cash drawer insert. Co-Conspirator 1 then reentered the Nissan with the cash drawer insert through the rear passenger door and **ELZEY** drove away. **ELZEY** and Co-Conspirator 1 stole approximately $270 in United States currency from Retail Business G. As a result of **ELZEY's** actions, interstate commerce was delayed, obstructed, or affected.

On August 1, 2022, at approximately 4:14 a.m., **ELZEY** drove the Nissan with Co-Conspirator 1 in the rear driver's side seat to the drive-through window of Retail Business H, a restaurant located in Catonsville, Maryland. Co-Conspirator 1, wearing a blue hooded sweatshirt, exited the rear passenger seat of the Nissan. When Victim 8, an employee of Retail Business H, opened the cash drawer, Co-Conspirator 1 reached through the window and attempted to remove the cash drawer while Victim 8 attempted to close the cash drawer. Co-Conspirator 1 then retrieved a firearm from his waistband and Victim 8 stepped back from the cash drawer. Co-Conspirator 1 then removed the cash drawer from within Retail Business H. Co-Conspirator 1 then reentered the Nissan with the cash drawer through the rear passenger door and **ELZEY** drove away. **ELZEY** and Co-Conspirator 1 stole approximately $5 in United States currency from Retail Business H's cash drawer. As a result of **ELZEY's** actions, interstate commerce was delayed, obstructed, or affected.

On August 1, 2022, at approximately 4:35 a.m. **ELZEY** drove the Nissan with Co-Conspirator 1 in the rear driver's side seat to the drive-through window of Retail Business I, a restaurant located in Glen Burnie, Maryland. Co-Conspirator 1, wearing a mask and a blue hooded sweatshirt, exited the rear passenger seat of the Nissan and began to pay Victim 9, an employee of Retail Business I. When Victim 9 opened the cash drawer, Co-Conspirator 1 reached through the window and attempted to remove the cash drawer insert while Victim 9 attempted to close the cash drawer. Co-Conspirator 1 held on to the cash drawer insert with one hand while repeatedly reaching toward his waistband, while Victim 9 held on to cash drawer insert before ultimately letting it go. Co-Conspirator 1 then removed the cash drawer insert from Retail Business I. Co-Conspirator 1 then reentered the rear driver's side door of the Nissan, carrying the cash drawer, and **ELZEY** drove away. **ELZEY** and Co-Conspirator 1 stole approximately $100 in United States currency from Retail Business I. As a result of **ELZEY's** actions, interstate commerce was delayed, obstructed, or affected.

On August 2, 2022, Co-Conspirator 1, **ELZEY**, and a third co-conspirator stole a grey Chevrolet Cruze ("Chevrolet") in Alexandria, Virginia before driving it across the state line to Maryland.

In the early morning of August 3, 2022, at approximately 2:08 a.m., **ELZEY** drove the Chevrolet with Co-Conspirator 1 in the rear driver's side seat to the drive-through window of Retail Business J, a restaurant located in Wheaton, Maryland. Co-Conspirator 1, wearing a dark sweatshirt, exited the rear passenger seat of the Nissan and began to pay Victim 10, an employee of Retail Business J. Co-Conspirator 1 held the sliding drive-through window open and reached for a firearm stored in his waistband while Victim 10 turned his back to Co-Conspirator 1 in order to open the cash drawer. Once the drawer was open, Co-Conspirator 1 slid the window open with his left hand while holding the firearm in his right hand and directed Victim 10 to get out of the way. Co-Conspirator 1 then reached through the window with both hands, while still holding the firearm, and removed the cash drawer while Victim 10 retreated further into Retail Business J.

Co-Conspirator 1 then reentered the Chevrolet with the cash drawer through the rear driver's side door and **ELZEY** drove away. **ELZEY** and Co-Conspirator 1 stole approximately $400 in United States currency from Retail Business J. As a result of **ELZEY's** actions, interstate commerce was delayed, obstructed, or affected.

Later the same day, at approximately 9:36 p.m., **ELZEY** drove the Chevrolet with Co-Conspirator 1 in the rear driver's side seat to the drive-through window of Retail Business K, a restaurant located in Laurel, Maryland. Co-Conspirator 1, wearing a grey hooded sweatshirt emblazoned with "Superdry" across the chest, exited the rear passenger seat of the Chevrolet and began to pay Victim 11, an employee of Retail Business K. After Victim 11 opened the cash drawer, Victim 11 observed Co-Conspirator 1 handle a firearm at his waistband. Victim 11 retreated further into Retail Business K. Co-Conspirator 1 then reached through the drive-through window and removed the now locked cash drawer from Retail Business K. Co-Conspirator 1 reentered the Chevrolet with the cash drawer through the rear driver's side door and **ELZEY** drove away. **ELZEY** and Co-Conspirator 1 stole approximately $150 in United States currency from Retail Business K. As a result of **ELZEY's** actions, interstate commerce was delayed, obstructed, or affected.

An hour and a half later, at approximately 10:59 p.m., **ELZEY** drove the Chevrolet with Co-Conspirator 1 in the rear driver's side seat to the drive-through window of Retail Business L, a restaurant located in Sterling, Virginia. Co-Conspirator 1, still wearing a grey hooded sweatshirt emblazoned with "Superdry" across the chest and a red visibility vest, exited the rear passenger seat of the Chevrolet and paid Victim 12, an employee of Retail Business L. As Victim 12 handed Co-Conspirator 1 a receipt, Co-Conspirator 1 reached into his waistband, and raised a firearm far enough that the ejection port was visible. Victim 12 stepped back from the cash drawer as Co-Conspirator 1 lowered the firearm back into his waistband. Co-Conspirator 1 then removed the locked cash drawer from within Retail Business L. Co-Conspirator 1 reentered the Chevrolet with the cash drawer through the rear driver's side door and **ELZEY** drove away. **ELZEY** and Co-Conspirator 1 stole approximately $443 in United States currency from Retail Business L. As a result of **ELZEY's** actions, interstate commerce was delayed, obstructed, or affected.

On August 4, 2022, at approximately 12:10 a.m., officers with the Montgomery County Police Department ("MCPD") stopped the Chevrolet in the area of Wheaton, Maryland. At the time of the stop, **ELZEY** was driving and Co-Conspirator 1, again wearing a grey hooded sweatshirt emblazoned with "Superdry" across the chest and a red visibility vest, was seated in the rear compartment. A search of the Chevrolet revealed: (1) a Taurus, Model G2C, 9mm caliber semi-automatic pistol bearing serial number AAM096052 in the rear passenger compartment; (2) Retail Business L's cash drawer in the footwell of the front passenger seat; and (3) Retail Business K's cash drawer in the trunk. Officers also seized cell phones belonging to **ELZEY** and Co-Conspirator 1 plus $427.01 in United States currency.

Law enforcement later obtained search warrants for call detail records with location information for both phones, one belonging to **ELZEY** and one belonging to Co-Conspirator 1. Analysis of this data showed that each phone was in the vicinity during or shortly before each of the robberies. This analysis also showed that each phone was in the vicinity of the below described incidents.

ELZEY and Co-Conspirator 1 also attempted to rob, through the drive-through window, six additional retail businesses, at the following dates, times, and locations:

| Date | Approx Time | Location |
|---|---|---|
| 7/28/2022 | 11:03 PM | Mt. Airy, Maryland |
| 7/28/2022 | 11:25 PM | Frederick, Maryland |
| 7/30/2022 | 1:29 AM | Westminster, Maryland |
| 8/1/2022 | 3:13 AM | Kensington, Maryland |
| 8/1/2022 | 3:30 AM | Olney, Maryland |
| 8/1/2022 | 11:58 PM | Cockeysville, Maryland |

Beginning on or around July 28, 2022, ELZEY, Co-Conspirator 1, and others changed the Maryland registration tag affixed to the Nissan and Chevrolet in an effort to avoid apprehension.

SO STIPULATED:

_____
Nicholas F. Potter
Special Assistant United States Attorney

Timothy F. Hagan
Assistant United States Attorney

_____
Brian Thornel Elzey
Defendant

_____
Gary E. Proctor / Jennifer E. Smith
Counsel for Defendant